1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

10

11

LAKEHURST CONDOMINIUM OWNERS
ASSOCIATION, a Washington nonprofit
corporation,

                Plaintiff,

      v.

CASE NO. C05-1987RSM

ORDER GRANTING DEFENDANTS'
 MOTIONS FOR PARTIAL SUMMARY
 JUDGMENT

12

13

14

15

16

17

18

19

20

STATE FARM FIRE AND CASUALTY
COMPANY, a foreign corporation, TRINITY
UNIVERSAL INSURANCE COMPANY OF
KANSAS, a foreign corporation, GREAT
AMERICAN ALLIANCE INSURANCE
COMPANY, a foreign corporation, AMERICAN
ALLIANCE INSURANCE COMPANY, a
foreign corporation, GREAT AMERICAN
INSURANCE COMPANY, a foreign
corporation, NATIONWIDE MUTUAL
INSURANCE COMPANY, a foreign
corporation, AMCO INSURANCE COMPANY,
a foreign corporation,

                Defendants.

21

22

## I. INTRODUCTION

23

24

25

26

27

28

      This matter is before the Court for consideration of motions for partial summary judgment brought by defendants American Alliance Insurance Company ("American") and Trinity Universal Insurance Company ("Trinity") (Dkts. # 26 and 38).  Defendants ask the Court to grant summary judgment on plaintiff's extra-contractual claims for breach of the duty of good faith and violation of the Washington Consumer Protection Act.  Plaintiff opposes both motions. For the reasons set forth below, the Court shall GRANT defendants' motions.

ORDER - 1

## II. DISCUSSION

**A. Background**

This case arises from an insurance claim for water intrusion damage at the Lakehurst Condominium Building located on N. E. 125th Street in Seattle, Washington. Almost two years after conducting an investigation of the damage, Lakehurst Condominium Owners Association ("Lakehurst") made claims to various insurers for direct physical loss or damage to the building. The claims alleged that the damage included *collapse caused by hidden decay*. Experts for the insurers performed subsequent investigations/inspections and drafted reports documenting their findings. Much of the material in the reports concerns whether collapse occurred under any one of the definitions accepted by the courts: 1) the dictionary definition of collapse, 2) substantial structural impairment, and 3) imminent danger of collapse.

In November 2003, Lakehurst arranged for the Tatley-Grund engineering firm to inspect the condominium building. The Tatley-Grund firm conducted an investigation and issued a report, which noted construction defects throughout the building, poor deck coating, evidence of water intrusion in a number of locations in the building, and evidence of mold and mildew in various parts of the building. The damage included significant decay in the exterior wall and deck framing. Significantly, the Tatley-Grund firm did not note any evidence of collapse.

Lakehurst possessed several insurance policies for the building for different time periods. The present motions were filed by the providers of two of those policies, Trinity Universal Insurance Company ("Trinity") and American Alliance Insurance Company ("American"). The policy provided by Trinity was in effect from September 1, 1999, to September 1, 2000. The policy provided by American was in effect from September 1, 2000, to September 1, 2001. Trinity and American's insurance policies are substantially similar. Trinity's policy excludes damage caused by decay, particularly that caused by water damage. American's policy also excludes loss or damage caused by decay as well as loss caused by water damage. However, both policies provide additional coverage for direct physical loss or damage to covered property "*caused by collapse of a building or any part of a building . . . if the collapse is caused by . . . hidden decay.*" Dkt. # 26 at 25; Dkt. # 38 at 11 (emphasis added).

ORDER - 2

Lakehurst's attorney notified American and Trinity of the water intrusion damage and reported its claim to the insurers on or about June 6, 2005. At that time, both American and Trinity began to conduct investigations of the Lakehurst building to determine whether the damage was covered by their policies.

In the midst of the investigations by Trinity and American, Lakehurst filed the present lawsuit in King County Superior Court on November 1, 2005. Lakehurst filed the lawsuit against all the insurers that had insured the building between March 1997 and September 2003: State Farm Fire and Casualty Company, Trinity Universal Insurance Company of Kansas, Great American Insurances Companies (American), Nationwide Mutual Insurance Company, and AMCO Insurance Company. On November 30, 2005, defendants removed the action to federal district court pursuant to 28 U.S.C. § 1441.

The complaint states four causes of action. First, Lakehurst seeks a declaratory judgment regarding coverage. Second, Lakehurst alleges breach of contract for failing to provide coverage determinations. Third, Lakehurst alleges breach of the duty of good faith. The complaint states that each insurer breached the duty of good faith in the following manner: "A. By failing to conduct an adequate investigation into the scope, nature and severity of the property damage to the Condominium; and B. By failing to adopt and implement reasonable standards for prompt investigation of plaintiffs' claims." Dkt. #27 at 5. Fourth, Lakehurst alleges breach of Washington's Consumer Protection Act, relying on the same standard as the bad faith claim. The motions at issue address the bad faith and Consumer Protection Act claims.

On May 19, 2006, Nationwide Mutual Insurance and AMCO Insurance were dismissed as defendants pursuant to a stipulation by Lakehurst. On January 30, 2007, State Farm Fire and Casualty was dismissed as a defendant pursuant to a stipulation by Lakehurst. The remaining defendants are Trinity and American.

*1. Investigation by American*

After receiving the original notice of Lakehurst's claim, American retained structural engineer James R. Perrault of JRP Engineering to investigate. On June 14, 2005, Mr. Perrault conducted an inspection of the Lakehurst building. Representatives from American, Lakehurst's counsel, and an architect retained by Lakehurst, Keith Soltner, also attended the inspection. Mr. Perrault later set forth

ORDER - 3

1   his observations in a report dated August 26, 2005.  In that report, he noted severe water damage and

2   decay.  The August 26 report also proposed a second inspection.

3        American received further correspondence from Lakehurst's counsel during August.  A letter

4   dated August 12, 2005, stated that there was significant decay to the structural components of the

5   Lakehurst Condominium, and that hidden decay rose to the level of collapse at some point prior to

6   November 8, 2003.  Lakehurst alleged that the collapse potentially occurred during the policy periods

7   issued by the various insurance companies, including American and Trinity.  Lakehurst requested that the

8   insurers make additional reasonable investigations and coverage determinations.  The insurers received

9   another letter from Lakehurst dated August 25, 2005, which was accompanied by a report from the

10  Tatley-Grund firm, documenting damage as of November 8, 2003.

11       Mr. Perrault analyzed the scope of the proposed second inspection in light of the Tatley-Grund

12  report.  He released a report on November 2, 2005, based on his examination of the Tatley-Grund report.

13  He recognized that the Tatley-Grund report showed several areas of severe decay and deterioration, and

14  he anticipated that his own proposed investigation would also reveal that decayed framing was present

15  because he would investigate similar locations.  He stated, "[i]t appears that the decay process in the

16  framing began well before the Tatley-Grund investigation was performed in Nov. 2003." Dkt. #26 at Tab

17  14, p. 2.

18       Mr. Perrault led the second site inspection on November 14, 2005.  He and his associates made

19  various exploratory openings and examined the building structure.  Representatives of Lakehurst and

20  several other defendants were present during the investigation.

21       After this second inspection, Mr. Perrault prepared a report dated January 16, 2006.  He stated

22  his opinion that the primary cause of loss and damage to the building was "faulty or inadequate

23  construction, including, but not limited to improper flashing."  Dkt. # 26, Tab 7, p. 3. A secondary cause

24  of the loss and damage was "normal, expected wear and tear and deterioration of improperly installed

25  caulking." *Id.*  Much of the investigation concerned whether collapse occurred.  Mr. Perrault concluded

26  that "during the period of September 1, 2000 to September 1, 2001, there was no collapse at the subject

27  building, nor was there imminent danger of collapse at the subject building, nor was there substantial

28

ORDER - 4

structural impairment at the subject building." *Id.*  During the inspections, Mr. Perrault observed that the building was occupied and in operation.  In his declaration, he noted that people were "coming and going from the building" and cars were "being driven into, out of, and parked in the garage that forms the base of the building." *Id.* at p. 4.  Finally, Mr. Perrault indicated that during the second inspection, he received no objections regarding his inspections of the subject building and received no suggestions or requests to change the scope of inspections.  He also indicated that Lakehurst's representatives did not object to any material in his reports.

Mr. Perrault's conclusions about the extent of the decay and the absence of collapse were based on the 2003 International Building Code (IBC) and Section 202 of the 2003 International Existing Building Code, a supplement to the 2003 IBC.  According to Mr. Perrault, the codes allow "a stress increase over the basic design stress" for "evaluating existing framing even if the framing is decayed." *Id.* at Exhibit F, p. 11.  He explained that Section 202 "allows for the basic design stresses to be multiplied by 1.33 (33% increase) when evaluating existing framing." *Id.*  Mr. Perrault used the 1.33 increase "for the allowable stresses as the threshold for whether framing would be classified as being in a state of substantial structural impairment." *Id.*  Using the 33% stress increase, Mr. Perrault concluded:

> Taking the framing members at these two corners as just reaching a state where they are completely decayed away when they were discovered in 2005, and projecting that the water intrusion started approximately one (1) year after the building was completed due to the failure of the caulking at the belly band flashing-to-corner trim joint, our calculations find that the corner studs, rim joints and wall plates at the corners, only reached a point where the [sic] could no longer support the code required loads within the past year. *Therefore, we project that the framing at these corners first reached a state of substantial structural impairment in 2004 and is only reaching a state of imminent collapse in 2005.*

*Id. (*emphasis added).  Mr. Perrault further found that at all other exploratory openings, the framing was not in a state of substantial structural impairment or imminent collapse at the time of the inspection or in the past.  Thus, Mr. Perrault concluded that the framing still would have been capable of supporting the code required wall, floor, and roof loads between September 1, 2000 and September 1, 2001, the period of the American insurance policy.

In addition to the investigations by Mr. Perrault, American wrote to Lakehurst requesting specific information to assist it in determining coverage.  American requested a sworn statement and proof of loss, documents related to the claim, and various other information related to the building damage.

ORDER - 5

1   However, Lakehurst objected to the request, alleging that it was improper and should have been made as

2   required by Civil Rule 34 because the declaratory judgment action was ongoing.

3       On January 31, 2006, American outlined, in a letter to Lakehurst, its preliminary position on the

4   claim.  It provided an explanation of its understanding of the facts and the relevant law.  Based on its

5   findings, American stated that its preliminary position was that there was no coverage under the policy

6   for the loss submitted by Lakehurst.  American reasoned that the damage which occurred was caused by

7   faulty construction, a cause of loss excluded under the policy.  It also reasoned that other potential

8   causes, such as decay or deterioration, were also excluded.  Finally, American concluded that there was

9   no collapse of the building, or any part of the building during the American policy period, based on any of

10  three definitions of collapse adopted by courts in the United States (substantial structural impairment,

11  imminent danger of collapse, or dictionary definition of collapse).  The letter requested that Lakehurst

12  produce additional facts or information to support its claim if it disagreed with American's preliminary

13  position.

14      On March 5, 2006, American informed Lakehurst in writing that it was officially denying the

15  claim.

16      *2. Investigation by Trinity*

17      After receiving notice of Lakehurst's claim, Trinity retained two experts to assist with its

18  investigation, Professor Robert Edmonds of the University of Washington College of Forest Resources,

19  and Ed Huston, an engineer with Smith & Huston, Inc.  Trinity retained Professor Edmonds to assist with

20  determining whether the Association's claim included any covered damage occurring during the Trinity

21  policy period.  Mr. Huston was retained to assist with determining the nature and cause of the damage

22  claimed by Lakehurst, including whether any damage had reached a state of imminent collapse or

23  substantial structural impairment during the Trinity policy period.

24      Professor Edmonds inspected the Lakehurst building on August 31, 2005.  After his investigation

25  and review of the Tatley-Grund report, he concluded:

26      Based on: (1) the current extent of decay on the second floor on the south side of the building
        (in August and November 2005), and (2) the growth rate of fungi that decay wooden
27      structures in the Pacific Northwest, it appears that the decay was probably in its early stages
        during the September 1999 to September 2000 period.  Deacy [sic] would not have been

28

ORDER - 6

extensive at that time.  Water penetration and staining, however, probably would have been obvious.

Dkt. #38, Bonanno Dec. at 209.

Mr. Huston conducted structural investigations to determine the extent of decay at the Lakehurst building on August 31, 2005 and November 14 and 15, 2005.  During the investigations, Mr. Huston simply observed openings that had already been made in previous investigations, and documented decay in many locations.  He prepared a report dated June 28, 2006.  In the report, Mr. Huston defined imminent peril of collapse as "the inability of structural members to support imposed dead load and the live loads likely to be in place when these gravity loads are the only loads acting on the building."  Dkt. #38, Bonanno Dec. at 240.  He explained, "[f]or wood framing, I believe that this condition occurs when the stresses in the wood elements are above 170% of the code allowed stresses."  *Id.*  Mr. Huston provided a similar definition for substantial structural impairment: "the inability of structural members to support imposed dead load and building code mandated live loads when these gravity loads are the only loads acting on the building."  *Id.* at 241.  He used the same allowable stress level of 170% of the code allowed stresses.

Based on his inspections, Mr. Huston concluded:

> Since I do not believe that the framing of this building is currently in imminent peril of collapse or in a state of substantial structural impairment, I also do not believe that this framing was in imminent peril of collapse or in a state of substantial structural impairment almost six years ago.  In fact, if any of these conditions were found to be in imminent peril of collapse or in a state of substantial structural impairment today, I do not believe they would have been in imminent peril of collapse or in a state of substantial structural impairment almost six years ago due to the progressive nature of the decay process.

Dkt. #38, Bonanno Dec. at 242(b).  Mr. Huston also made conclusions regarding the cause of the damage:

> I was not present when some of these openings were originally made and was unable to see how the original weather resistant barrier was applied.  Where I could see the application of the barrier I noted serious failures in the application.  I believe that the major cause of decay at this building was due to these deficiencies in the original construction.

*Id.*

On August 17, 2006, Trinity officially denied the claim in writing.  The basis for denial of the claim was that the cause of loss was defective and inadequate construction, which is not covered under the policy.  Further, the denial letter noted that the loss was not covered under the collapse caused by

ORDER - 7

1  hidden decay provision because the "loss the insured sustained had not commenced or reached a state of

2  collapse during the policy period when we insured the Condominium Association." *Id.* at 276.

3         These denials form the basis for Lakehurst's claims of bad faith and violation of the Washington

4  Consumer Protection Act.  Defendants American and Trinity have moved for partial summary judgment

5  on these two extra-contractual claims.

6  **B. Summary Judgment Standard**

7         Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and

8  admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact

9  and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v.*

10  *Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The

11  Court must draw all reasonable inferences in favor of the non-moving party. *See Anderson,* 477 U.S. at

12  255.  Nevertheless, "the plain language of Rule 56(c) mandates the entry of summary judgment . . .

13  against a party who fails to make a showing sufficient to establish the existence of an element essential to

14  that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at

15  322.  Mere disagreement, or the bald assertion that a genuine issue of material fact exists, no longer

16  precludes the use of summary judgment. *See Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989)

17  (citing *California Architectural Blgd. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468

18  (9th Cir. 1987)).  However, summary judgment should not be granted as to an issue unless it is clear that

19  trial on that issue is unnecessary. *Anderson*, 477 U.S. at 255.

20         Genuine factual issues are those for which the evidence is such that "a reasonable jury could

21  return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.  Material facts are those which

22  might affect the outcome of the suit under governing law. *See id.*  In ruling on summary judgment, a

23  court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there

24  is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994).

25

26  **C. Insurance Bad Faith**

27         In Washington, insurers have a duty to act in good faith and to deal fairly with their insureds, and

28

ORDER - 8

violation of that duty may give rise to a tort action for bad faith. *Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 484, 78 P.3d 1274 (2003) (citing *Truck Ins. Exch. v. Vanport Homes, Inc.*, 147 Wn.2d 751, 765, 58 P.3d 276 (2002)). According to RCW 48.01.030, "[t]he business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, their providers, and their representatives rests the duty of preserving inviolate the integrity of insurance."

The duty to act in good faith requires the insurer to act reasonably in interpreting the policy and investigating the claim. *See Torina Fine Homes v. Mutual of Enumclaw Ins. Co.*, 118 Wn. App. 12, 21, 74 P.3d 648 (2003), *rev. denied*, 151 Wn.2d 1010, 89 P.3d 712 (2004). A denial of coverage that is unreasonable, frivolous, or unfounded constitutes bad faith. *Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 484, 38 P.3d 322, 329 (2003); *Kirk v. Mt. Airy Ins. Co.*, 134 Wn.2d 558, 560, 951 P.2d 1124 (1998). In *Smith*, the Washington Supreme Court explained the relative burdens of policyholders and insurers for claims alleging bad faith denial of insurance coverage:

> If the insured claims that the insurer denied coverage unreasonably in bad faith, then *the insured must come forward with evidence that the insurer acted unreasonably*. The policyholder has the burden of proof. The insurer is entitled to summary judgment if reasonable minds could not differ that its denial of coverage was based on reasonable grounds . . . If, however, reasonable minds could differ that the insurer's conduct was reasonable, or if there are material issues of fact with respect to the reasonableness of the insurer's action, then summary judgment is not appropriate. If the insurer can point to a reasonable basis for its action, this reasonable basis is significant evidence that it did not act in bad faith and may even establish that reasonable minds could not differ that its denial of coverage was justified.

*Smith*, 150 Wn.2d at 486 (emphasis added). Thus, the test is not whether the insurer's interpretation of the policy is correct but whether the insurer's conduct was reasonable. *Wright v. Safeco Ins. Co.*, 124 Wn. App. 263, 279-80 (2004) (citing *Torina Fine Homes*, 118 Wn. App. at 21).

This Court must determine whether genuine issues of material fact remain as to the reasonableness of the insurers' policy interpretations and investigations. If reasonable minds could not differ that the insurers' denials of coverage were based on reasonable interpretations of the policies, and that they conducted reasonable investigations to make their final determinations, then this Court must

ORDER - 9

1  grant partial summary judgment in favor of the insurers.[1]  American and Trinity conducted similar

2  investigations of Lakehurst's claims and came to similar conclusions: the damage to the Lakehurst

3  building is not covered by the respective policies because there was no collapse caused by hidden decay

4  during the policy periods.

5       Two issues must be resolved regarding the bad faith claim.  The first is whether genuine issues of

6  material fact remain as to whether American and Trinity conducted *reasonable investigations* of the

7  claims.  The second is whether genuine issues of material fact remain as to whether American and Trinity

8  *reasonably interpreted* their policies to conclude that Lakehurst's claims were not covered.       *1.*

9  *Reasonable Investigations*

10      There is no question that the investigations performed by American and Trinity were reasonable.

11  Both insurers hired qualified experts, and the experts conducted extensive inspections of the subject

12  property.  Although American and Trinity may be ultimately incorrect in their determinations of no

13  coverage, their prompt and thorough investigations were reasonable.  Nevertheless, Lakehurst alleges

14  that the investigations were unreasonable because 1) they were not tailored to the language of the

15  policies; 2) the insurers failed to investigate decay to exterior shear walls; 3) Trinity did not investigate

16  whether any part of the building was in collapse; and  4) American had an additional duty to investigate

17  all the hidden decay because of its rationale for denying coverage.

18      First, Lakehurst argues that the investigation was unreasonable because it was not tailored to the

19  scope of coverage providing for collapse of a building "or any part" of a building caused by hidden decay.

20  Lakehurst alleges that the insurer has a duty to "look at each discrete element that suffers from hidden

21  decay and determine whether *any part* of the building is in collapse."  Dkt. #43 at 23.  Requiring such an

22  investigation would be unreasonable in itself.  To meet the standard for a "reasonable investigation," the

23  insurers are not required to tear all the siding off the entire occupied building and inspect every single

24  piece of wood that might be subject to decay.  Such an exercise would destroy the appearance of the

25

26      [1]This rule is different than the standard purportedly adopted in *Ellwein v. Hartford Accident &*
   *Indemnity Co.*, 142 Wn.2d 766, 15 P.3d 640 (2001), which was overruled by *Smith*.  The *Ellwein*
27  standard purportedly allowed summary judgment for the insurer if there existed some theoretical
   reasonable basis for the insurer's conduct.  *Id.* at 776.  Here, however, the inquiry is whether the grounds
28  actually relied on by the insurer to deny the claim are reasonable.

building and likely upset its inhabitants.  The insurers conducted an extensive investigation of decay both at places where their experts made openings in the building walls and where Lakehurst's own engineering firm, Tatley-Grund, made openings.  This investigation was sufficiently tailored to the scope of coverage to meet the test of reasonableness.

Second, Lakehurst argues that it was unreasonable for the insurers to fail to investigate hidden decay to exterior shear walls.  In its opposition to the motions for partial summary judgment, Lakehurst states, "[s]hear walls can become substantially impaired when there is decay to the plywood sheathing even if there is no corresponding decay to the underlying framing because the decay to the sheathing can reduce the rigidity of the assembly."  *Id.* at 24.  Lakehurst produces no evidence that the shear walls actually had become substantially impaired or that the insurers should have been on notice of substantial impairment of the shear walls.  Thus, Lakehurst fails to create a genuine issue of material fact as to the reasonableness of this element of the investigation.

Third, Lakehurst argues that Trinity's investigation was unreasonable because it did not investigate whether *any part* of the building was in collapse.  Specifically, Lakehurst alleges that Trinity's expert, Mr. Huston, only examined the building as a system, and not each part of the building individually to determine the extent of the decay.  However, in making its argument that Trinity did not investigate "any part of the building," Lakehurst mischaracterizes Mr. Huston's deposition testimony.  Huston never stated that the entire building "as a system" must be in a state of collapse.  Rather, in his deposition testimony, Mr. Huston referred to specific systems or parts of the building, noted the decay within those systems, and concluded that each system could retain the necessary structural integrity through remaining load-bearing members.  Mr. Huston's approach was reasonable because it examined both individual locations of decay and the effect of that decay on the systemic stability of the building in different locations.  Mr. Huston, as a structural engineer, is qualified to make the determination of the necessary scope of his investigation.

Fourth, Lakehurst argues that American's investigation was unreasonable because the insurer did not thoroughly investigate "all of the hidden decay" and when the decay began. As already noted, an expectation that American inspect every single part of the building by tearing off the siding would be unreasonable in itself. While American may be ultimately incorrect concerning the extent of the decay or

when the decay began, that is not the question here.  Rather, the question is whether American's investigation and ultimate finding that collapse caused by hidden decay did not occur during the American policy period was reasonable.

Lakehurst produces no evidence that American's actions were unreasonable.  American's expert, Mr. Perrault, conducted an extensive investigation, observed openings at the subject building, observed photographs from Lakehurst's experts (Tatley-Grund), and made conclusions based on his findings. Lakehurst emphasizes that Mr. Perrault incorrectly assumed the framing was put up dry.  Mr. Perrault projected that water intrusion began one year after the building was completed due to the failure of the caulking.  While his projection may be incorrect that does not mean it was unreasonable.  Because Lakehurst fails to produce evidence that there was actual water *damage* prior to the completion of the building, and Mr. Perrault based his projection on a legitimate factor (the failure of the caulking at the belly band flashing-to-corner trim joint) there is no reason to believe that Mr. Perrault's assumption was unreasonable, even though it may be ultimately incorrect.

Not one of Lakehurst's four allegations creates a genuine issue of material fact as to the reasonableness of the insurers' investigations.  As stated in *Smith*, "[i]f the insured claims that the insurer denied coverage unreasonably in bad faith, then the insured must come forward with evidence that the insurer acted unreasonably." 150 Wn.2d at 486.  Lakehurst fails to meet that standard in this case. Lakehurst produces no evidence, but merely conclusory statements about the alleged unreasonableness of the investigations of American and Trinity.  It may be true that a highly intrusive investigation of every single part of the building might provide more information to the insurers, but the failure of the insurers to do so does not indicate that their investigations were unreasonable.

### 2. Reasonable Policy Interpretations

Lakehurst also alleges that the insurers acted in bad faith by using unreasonable policy interpretations to conclude that there was no coverage.  Specifically, Lakehurst argues that the definition of collapse used by each insurer was unreasonable; the use of a multiplier to measure whether collapse had occurred was unreasonable; and the insurers failed to analyze whether "any part of the building" rose to the level of collapse.

First, Lakehurst argues that the insurers unreasonably interpreted collapse to mean imminent risk

ORDER - 12

or actual collapse rather than substantial impairment.  That allegation is perplexing because Lakehurst

stated in its opposition to the motions for partial summary judgment that "Mr. Perrault [American's

expert] opined that the damage at Lakehurst did not reach a state of substantial structural impairment

until 2004 . . . " *Id.* at 10-11, and Trinity's expert, Mr. Huston, "evaluated collapse based on two

standards 'imminent peril of collapse' and 'substantial structural impairment.'" *Id.* at 13.  The reports of

Mr. Perrault and Mr. Huston clearly state that they used both the imminent risk of collapse and the

substantial impairment standards.  Dkt. #26 at Tab 7, Exhibit F, p. 11 (Perrault report); Dkt. #38,

Bonanno Dec. at 241-242 (Huston report).

Second, Lakehurst argues that the insurers unreasonably measured substantial impairment by

using stress level multipliers.  In determining the structural integrity of the building, American's expert

multiplied the Uniform Building Code (UBC) stress level by 1.33.  Trinity's expert used a multiplier of

1.70.  Lakehurst alleged that using such multipliers was unreasonable because the UBC maximum stress

level is the appropriate measure.  Lakehurst's argument equates the UBC standard for safety with the

standard for substantial impairment of structural integrity.  However, it fails to cite any source which

states that those two standards measure the same thing.  Further, in deposition testimony, American's

expert, Mr. Perrault, explained that "the 2003 International Building Code (IBC) allows a 33 percent

increase."  Dkt. #47 at 6.  Mr. Perrault equated the dangerous condition standard of the IBC with the

standard for substantial structural impairment.  Lakehurst has not provided any expert opinion to suggest

that reasonable minds could differ in this approach.  The Court finds that Mr. Perrault's determination

was therefore reasonable.

Trinity argues that the use of multipliers is the industry standard.  Its expert, Mr. Huston used the

same 1.70 multiplier for determining imminent peril of collapse and substantial structural impairment.

Although the use of the same multiplier to determine imminent peril of collapse and substantial structural

impairment does appear to be unusual, Lakehurst fails to present evidence indicating that the multiplier

used by Trinity is inappropriate.  Mr. Huston explained the use of the multiplier in his report and in more

detail in his deposition.  Dkt. #38, Bonanno Dec. at 240-41; Dkt. #43, Martin Dec., Exhibit 3, pp. 28-34

(distinguishing the use of live loads for imminent peril of collapse and code-mandated live loads for

substantial structural impairment).  Mr. Huston explained that he used the 1.70 multiplier because the

1    "actual point where the wood would – could begin to come into a threshold of failure is at about 170 to

2    200 – 166 to 200 percent" of the safe allowable stress.  Dkt. #43, Martin Dec., Exhibit 3, p. 32.  The use

3    of multipliers presents a close question as to whether there is a genuine issue of material fact concerning

4    the reasonableness of the approach, but the explanations of Mr. Huston and Mr. Perrault are reasonable.

5    Furthermore, Lakehurst presents no evidence of a different standard for determining *collapse*.  Thus,

6    Lakehurst fails to create a genuine issue of material fact as to the reasonableness of Trinity's use of a

7    multiplier to determine whether collapse occurred.

8         Finally, Lakehurst argues that the insurers unreasonably ignored the "any part of the building"

9    language in the policies.  In essence, Lakehurst's allegation is that the insurers only examined whether the

10   building as a whole is in a state of collapse rather than whether "any part of the building" is in a state of

11   collapse.  Lakehurst is incorrect.  The experts for both American and Trinity evaluated the extent of

12   decay at several different locations within the building in order to determine whether any of the locations

13   were in a state of collapse during their policy periods.  Furthermore, Lakehurst fails to present any

14   evidence of collapse in "any part of the building."

15        Lakehurst fails to present genuine issues of material fact as to the reasonableness of the insurers'

16   policy interpretations.  The Court thus finds that American and Trinity acted reasonably in their

17   investigations, policy interpretations, and ultimate denials of coverage for the Lakehurst property

18   damage, so they did not violate the duty of good faith.

19   **D. Washington Consumer Protection Act**

20        To prevail on a Washington Consumer Protection Act (CPA) claim under RCW 19.86 (2006),

21   Lakehurst must show: (1) an unfair or deceptive act or practice; (2) in trade or commerce; (3) which

22   affects the public interest; (4) that injured the plaintiff's business or property; and (5) that the unfair or

23   deceptive act complained of caused the injury suffered.  *Hangman Ridge Training Stables, Inc. v. Safeco*

24   *Title Ins. Co.*, 105 Wn.2d 778, 784-785, 719 P.2d 531 (1986).  The Washington Administrative Code

25   (WAC) contains specific consumer protection standards for the insurance industry.  The regulations

26   provide that "failing to adopt and implement reasonable standards for the prompt investigation of claims

27   arising under insurance policies" and "refusing to pay claims without conducting a reasonable

28   investigation" are unfair or deceptive acts or practices.  WAC 284-30-330 (2007).  Violations of WAC

ORDER - 14

1  284-30-330 constitute per se violations of the Consumer Protection Act.  *Truck Ins. Exchange v.*

2  *Vanport Homes, Inc.*, 147 Wn.2d 751, 764, 58 P.3d 276 (2002).

3      Based on the above analysis concerning the bad faith claims, there are no genuine issues of

4  material fact remaining as to whether American and Trinity violated the CPA.  The two insurers used

5  reasonable standards for the prompt investigation of Lakehurst's claim, and the investigations and

6  ultimate decisions to deny coverage were also reasonable.  Thus, Lakehurst fails to create a genuine issue

7  of material fact as to whether the insurers violated the CPA by engaging in an unfair or deceptive act or

8  practice.

9                          **III.  CONCLUSION**

10      For the foregoing reasons, both defendants' motions for partial summary judgment regarding

11  extra-contractual claims are GRANTED.

12

13      DATED this ___1___ day of May 2007.

14

15                          RICARDO S. MARTINEZ
                           UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER - 15